UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
DAVID A. COHEN and JORDCAM REALTY,      :
LLC,                                     :
               Plaintiffs,      :      **OPINION AND ORDER**
                               :
v.                                       :      16 CV 265 (VB)
                               :
LEE MAHER and SOLARBLUE, LLC,            :
               Defendants.      :
----------------------------------------------------------x

Briccetti, J.:

     Plaintiffs David A. Cohen and JORDCAM Realty, LLC ("JORDCAM"), bring this action for breach of contract against defendants Lee Maher and SolarBlue, LLC ("SolarBlue").

     Before the Court is defendants' motion to dismiss the amended complaint (Doc. #20) based on (i) lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2); (ii) forum non conveniens, which the Court construes as a motion to transfer venue under 28 U.S.C. § 1404(a); and (iii) failure to state a claim under Fed. R. Civ. P. 12(b)(6).  (Doc. #47).

     For the reasons set forth below, the motion is DENIED.

     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).

## BACKGROUND

     In deciding the pending motion, the Court accepts as true all well-pleaded allegations in the amended complaint, along with "any documents attached to that pleading or incorporated into it by reference, any documents that are integral to the plaintiff's allegations even if not explicitly incorporated by reference, and facts of which the court may take judicial notice."  BLT Rest. Grp. LLC v. Tourondel, 855 F. Supp. 2d 4, 15 (S.D.N.Y. 2012) (internal quotation marks omitted).

Plaintiff Cohen is a New York citizen and the sole member of plaintiff JORDCAM. Defendant Maher and his wife Mary Maher, a non-party, are Florida citizens and are the sole members of defendant SolarBlue, which is registered in Florida and organized under Florida law.

In 2008, SolarBlue began securing long-term contracts, known as Energy Savings Agreements ("ESAs"), with various vacation properties, including Wyndham and Hilton vacation properties, whereby "SolarBlue would implement energy saving systems at the . . . properties in exchange for monthly payments."  (Am. Compl. ¶ 16).  Pursuant to these ESAs, SolarBlue would install systems to generate renewable energy for the property in exchange for monthly payments for as long as twenty years.

In 2014, SolarBlue sought to monetize the Wyndham ESAs by selling the rights to the monthly payments for a lump sum of cash.  Defendants sought plaintiffs' assistance in this effort, and "Cohen agreed to assist Maher and SolarBlue . . . in monetizing the revenue stream from the Wyndham ESA Contracts."  (Am. Compl. ¶ 33).  As a condition, Cohen insisted on exclusivity, meaning that "he would be compensated in the event SolarBlue . . . entered into any transaction monetizing the revenue stream from the Wyndham ESA Contracts, regardless of whether or not Cohen was the procuring source of the transaction."  (Id.).

On May 20, 2014, after weeks of negotiation, JORDCAM through Cohen and SolarBlue through Maher entered into a written agreement (the "Agreement"), which provided for Cohen to receive a fee of eight percent of the value of the monetized ESAs from the Wyndham and Hilton properties, and for Cohen to be engaged on an exclusive basis.  "The Agreement recited that 'the Company [defined to include Maher, SolarBlue, and its affiliates] seeks to monetize the cash flows of Wyndham and Hilton properties for which they have, or shall enter into, energy savings or other lease agreements, leases, and/or other contracts (the "Contracts") throughout the United

States and other territories and countries (the "Properties")."  (Am. Compl. ¶ 41, quoting Cohen

Decl. Ex. 5).  The Agreement provides, in relevant part:

> 1.    In consideration of Cohen to assist the Company to arrange the Financing,[1] the Company will pay to Cohen an amount equal to eight percent (8.00%) of the total commitments of the Financings for all or any portion of the Properties, which shall be earned and paid by the Company upon the closing of a Financing (the "Fee").  Cohen shall be paid the Fee by the Company via wire transfer from escrow in certified U.S. Dollars to the designated bank account coordinates designated by Cohen.  This Agreement shall be an exclusive arrangement granted to Cohen, except with respect to Energy Savings Agreements entered into between Solar Blue and a lessee after the date hereof and the Company's obligation to pay the Fee shall survive with respect to any Financing arranged by the Company or otherwise.  Cohen shall act solely as the Company's agent under this Agreement and as an independent contractor, and not as the Company's partner or joint venturer.

(Cohen Decl. Ex. 5 ¶ 1 (footnote added)).

Because the parties came to realize Cohen could assist SolarBlue in monetizing other

ESAs, and Cohen recognized that SolarBlue might enter into Financings regarding new ESAs

with parties Cohen had previously introduced to SolarBlue and Maher and the Agreement did not

provide for Cohen to receive the Fee for those Financings, the parties sought to amend the

Agreement.

On June 3, 2014, the parties agreed to an amendment (the "Amendment"), which

provides, in relevant part:

> 2.    Section 1 of the Agreement is hereby amended and replaced to read as follows:
>
> > In consideration of Cohen to assist the Company to arrange the Financing, the Company will pay to Cohen an amount equal to eight percent (8.00%) of the total commitments of the Financings for all

---

[1]    "Financings" are specifically defined elsewhere in the Agreement: "Cohen shall assist the Company to arrange the financing to monetize the cash flows of the Contracts regarding any or all of the [Wyndham and Hilton properties] through a placement with one or more financing sources or through a capital markets execution ('Financing' or collectively, 'Financings')." (Cohen Decl. Ex. 5).

> or any portion of the Contracts, Properties or other Financings, which shall be earned and paid by the Company upon the closing of a Financing (the "Fee").  Cohen shall be paid the Fee by the Company via wire transfer from escrow in certified U.S. Dollars to the designated bank account coordinates designated by Cohen.  This Agreement shall be an exclusive arrangement granted to Cohen. The terms of this Agreement shall be applicable to any future Financings of the Company or its affiliates, with or without involving the Contracts, Properties or otherwise, which involves financing sources or parties that are or were introduced by Cohen to the Company, and the Company's obligation to pay the Fee shall survive with respect to any Financing arranged by the Company or otherwise.  Cohen shall act solely as the Company's agent under this Agreement and as an independent contractor, and not as the Company's partner or joint venturer.

(Cohen Decl. Ex. 8 ¶ 2).

Beginning in 2014, SolarBlue negotiated with both Lance Capital LLC ("Lance Capital") and TowPath Renewables ("TowPath") to monetize the Wyndham ESAs.  Cohen introduced Lance Capital, but not TowPath, to SolarBlue, but he was involved in the negotiations with both. Through 2014 and early 2015, "Cohen continued to provide SolarBlue with services for both potential transactions."  (Am. Compl. ¶ 58).

While SolarBlue was still negotiating with both TowPath and Lance Capital, defendants sought to renegotiate the relationship with Cohen.  "[I]n early July 2015, [d]efendants asked Cohen to accept $95,500 (or roughly three percent (3%) of the transaction value) as his compensation for the closing of the TowPath transaction, which [d]efendants advised Cohen was the transaction most likely to close at that point in time."  (Am. Compl. ¶ 61).  Defendants informed Cohen they would not pay him any compensation unless he agreed to the reduced fee, but Cohen refused to renegotiate to the lower fee.  In response, defendants stopped communicating with Cohen about the Wyndham ESAs or otherwise, despite Cohen's repeated attempts to correspond.

4

Around October 2015, defendants agreed to a Financing for the Wyndham ESAs with TowPath for approximately $3,200,000.  Defendants refused to pay plaintiffs anything.

Plaintiffs allege defendants had many contacts related to New York throughout the course of these events.  Specifically, plaintiff alleges "[t]he Agreement and the Amendment were made in New York, and were executed by Cohen while he was located in New York."  (Am. Compl. ¶ 52).  Moreover, plaintiffs allege "Maher, in his individual capacity and on behalf of SolarBlue . . . came to New York for several meetings in connection with the Agreement and the efforts to monetize the Wyndham ESA Contracts, including meetings with Cohen, Lance Capital," and other companies.  (Id. ¶ 57).  Finally, the Agreement includes a choice of law clause designating New York's as the governing law.

## DISCUSSION

I.   Legal Standards

    A.   Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

On a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "plaintiff[s] bear[] the burden of showing that the court has jurisdiction over [each] defendant."  In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003).  Prior to conducting discovery, plaintiffs may defeat a motion to dismiss "by pleading in good faith legally sufficient allegations of jurisdiction."  Ball v. Matallurgie Hoboken–Overpelt, S.A., 902 F.2d 194, 197 (2d Cir. 1990).  Plaintiffs can also make this showing through their own affidavits and supporting materials containing an averment of facts that, if credited, would suffice to establish jurisdiction over defendants.  Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001).  "[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff[s] and doubts are resolved in the plaintiff[s'] favor."  A.I. Trade Fin., Inc. v. Petra Bank,

989 F.2d 76, 79–80 (2d Cir. 1993).  When deciding a motion to dismiss for lack of personal

jurisdiction, the Court must consider defendants' contacts with the forum state at the time of

plaintiffs' filing of the complaint.  Nelson v. Mass. Gen. Hosp., 2007 WL 2781241, at *13

(S.D.N.Y. Sept. 20, 2007).

      B.    Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

In deciding a Rule 12(b)(6) motion for failure to state a claim, the Court evaluates the

sufficiency of the operative complaint under the "two-pronged approach" articulated by the

Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  First, plaintiffs' legal

conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to

withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).

Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity

and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v.

Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard

of "plausibility."  Id. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007).  A claim is

facially plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal,

556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully."  Id.

II.    Personal Jurisdiction

Defendants move to dismiss for lack of personal jurisdiction.  Plaintiffs contend specific

personal jurisdiction exists over each defendant with respect to their claim.

To determine whether specific personal jurisdiction exists, the Court engages in a two-step inquiry.  Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010).  First, the Court determines whether the forum state's law permits the exercise of jurisdiction over each defendant.  Id.  "[T]he second step is to analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution."  Id. at 164.

A.    New York's Long-Arm Statute

New York's long-arm statute provides, "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, . . . who in person or through an agent[,] transacts any business within the state."  N.Y. C.P.L.R. § 302(a)(1).  Thus, the Court must determine whether defendants have sufficient business contacts in New York that give rise to plaintiffs' breach of contract claim.

The Court properly considers the following factors in deciding whether a foreign defendant transacts business in the New York, including:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [defendants] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22–23 (2d Cir. 2004) (internal quotation marks omitted).  "[N]o one factor is dispositive and other factors may be considered.  The ultimate determination is based on the totality of the circumstances."  Id. at 23 (citations and internal quotation marks omitted).

First, defendants initiated discussions about this arrangement with Cohen while Cohen was in New York, and Cohen negotiated with defendants exclusively from New York.  Although

7

many of the negotiations occurred via telephone and email, and therefore defendants were not always in New York and Cohen was not required to be in New York, Cohen informed defendants he lived and worked in New York.  Cohen avers, "I was located in New York for all of the negotiations. . . .  I had previously advised both Mr. Maher and [SolarBlue's Chief Financial Officer] that I resided in New York."  (Cohen Decl. at ¶ 13).  "Maher on his own behalf and on behalf of [SolarBlue] traveled to New York City on multiple occasions in connection with the specific subject matter of this action."  (Am. Compl. ¶ 11).  Thus, defendants visited New York to meet with parties to the contract regarding the relationship.

Furthermore, defendants were well aware the New York plaintiffs would perform the contract in New York.  Although the contract did not explicitly state performance must occur in New York, defendants knew that a substantial portion of performance would occur in New York. For example, Cohen avers, "I made clear to Mr. Maher that I would be working on this project in New York, where I reside and work."  (Cohen Decl. at ¶ 8).  Cohen informed defendants of New York contacts he would use to attempt to monetize the ESAs.

Moreover, the parties included a New York choice of law clause, which "is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law."  Sunward Elecs., Inc. v. McDonald, 362 F.3d at 23.

Finally, although the Agreement does not explicitly require defendants "to send notices and payments into the forum state," it provides Cohen would determine where defendants' payments were to be sent.  Because defendants knew they were conducting business with New Yorkers, and thus payments would likely be sent to New York, the lack of a specific New York bank account does not strongly counsel against the conclusion that defendants transacted business in New York.

Given the totality of the circumstances, including each defendant's interactions in New York with a New York corporation and a New York individual, the Court concludes each defendant transacted business in New York.

Turning "to the arising under prong[,] . . . [a] cause of action arises out of a defendant's transaction of business in New York for purposes of Section 302(a)(1) when there exists an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon."  Sunward Elecs., Inc., v. McDonald, 362 F.3d at 23 (internal quotation marks omitted).

Here, the cause of action is for breach of contract.  The Agreement, the Amendment, and the alleged breach thereof are all inextricably tied to New York.  As stated above, defendants sought out a company and individual they knew to be New Yorkers located in New York. Defendants negotiated with plaintiffs while Cohen was in New York, and defendants traveled to New York to meet with plaintiffs in New York regarding this business.  Plaintiffs informed defendants the contractual obligations would be performed in New York and such performance would include soliciting third-party New Yorkers.  Moreover, the Agreement designated New York's as the applicable law.

Accordingly, the defendants' New York transactions have an articulable nexus and substantial relationship to the cause of action, such that the cause of action arises from those New York transactions.  Therefore, New York law allows for the exercise of personal jurisdiction over defendants with respect to this claim.

B.    Due Process

"[T]o satisfy the Due Process Clause of the United States Constitution, the exercise of long-arm jurisdiction by New York must be based on defendants' 'minimum contacts' with the

state and must comport with 'traditional notions of fair play and substantial justice.'" Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 32 (2d Cir. 1996) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).  A court does not violate Due Process by exercising personal jurisdiction when "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472–73 (1985) (citation and internal quotation marks omitted).  In the context of "interstate contractual obligations, . . . parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." Id. at 473 (internal quotation marks omitted).

As already explained, defendants sought out New York plaintiffs while plaintiffs were located in New York.  Defendants engaged in on-going and substantial negotiations with New York plaintiffs, and traveled to New York on multiple occasions to meet with plaintiffs regarding the Agreement and Amendment.  Defendants were aware plaintiffs would perform the contract in New York and would solicit third-party New Yorkers.  Defendants agreed that the contractual obligations would be subject to New York law.  The Court concludes defendants "purposefully availed themselves of the forum and should have reasonably foreseen being hailed into court here." Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d at 32.

Accordingly, each defendant's business transactions relating to New York are sufficient to exercise personal jurisdiction here.

III.   Transfer

Defendants argue "this Court should dismiss the Complaint against [defendants] on grounds of forum non conveniens."  (Doc. #48 at 7).

The Court disagrees.

Defendants argue this case should be transferred to federal court in Florida.  However, as defendants state, "[t]he common-law doctrine of <u>forum</u> <u>non</u> <u>conveniens</u> has continuing application in federal courts only in cases where the alternative forum is abroad.  With respect to cases wholly within the system of U.S. federal courts, the doctrine of forum non conveniens has been largely replaced by the transfer of venue statute, 28 U.S.C. § 1404(a)."  (Doc. #48 at 5 (internal quotation marks, alterations, and citation omitted)).  Because the proposed alternative forum is not abroad, <u>forum</u> <u>non</u> <u>conveniens</u> is inapplicable.

However, the substance of each side's argument addresses whether this case should be transferred to federal court in Florida under Section 1404(a), and therefore the Court construes defendants' motion to dismiss as a motion to transfer venue.

Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

A motion to transfer venue first requires the Court to decide whether the case could have been brought in the transferee district.  <u>Glass v. S & M NuTec</u>, 456 F. Supp. 2d 498, 501 (S.D.N.Y. 2006).  If the case could have been brought in the transferee district, the Court must next decide whether transfer is warranted based on the following:

> (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of the operative facts; (5) the availability of process to compel attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

Glass v. S & M NuTec, 456 F. Supp. 2d at 501; see also D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 106 (2d Cir. 2006).  A district court has broad discretion to balance these factors and to consider the evidence of convenience and fairness on a case-by-case basis to protect litigants and prevent the waste of time, energy, and resources.  See Van Dusen v. Barrack, 376 U.S. 612, 616 (1964); Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d 513, 520 (2d Cir. 1989).  The moving party has the burden of justifying transfer of venue as plaintiffs' choice of forum should control absent a "strong case for transfer."  Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 865 F.2d at 521.

A.   Could the Case Have Been Brought in Federal Court in Florida?

Defendants assert "Florida is an available and adequate alternative forum to this Court." (Doc. #48 at 5).  Florida is not a forum; it is a state.  A forum is a court.  Because both defendants are from Orlando, Florida, the Court addresses whether the United States District Court for the Middle District of Florida is appropriate, as it is the federal district court with territorial jurisdiction over Orlando.

"For the purposes of section 1404(a), an action might have been brought in another forum if, at the time the action was originally filed, the transferee court would have had subject matter jurisdiction and personal jurisdiction over the defendants, and if venue would have been proper in the transferee court."  Posven, C.A. v. Liberty Mut. Ins. Co., 303 F. Supp. 2d 391, 401 (S.D.N.Y. 2004); see also 17 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 111.12[1][a] (3d ed. 2010) (explaining the requirements for whether the transferee court is one in which the action "might have been brought").

Subject matter jurisdiction would have existed based on diversity, 28 U.S.C. § 1332(a), for the same reasons diversity jurisdiction exists here.  Personal jurisdiction would have existed

12

over both defendants as both are Florida citizens.  Finally, venue would have been proper

because "all defendants are residents of the State in which the district is located."  28 U.S.C.

§ 1391(b)(1).  Therefore, this action could have been brought in the Middle District of Florida.

      B.    <u>Is Transfer Warranted?</u>

Defendants argue transfer is warranted due to the convenience of parties and witnesses,

the location of relevant documents and sources of proof, and the locus of operative facts.

      The Court disagrees.

Regarding the convenience of parties and witnesses, the parties are equally split between

Florida and New York.  Maher and SolarBlue are Florida citizens, while Cohen and JORDCAM

are New York citizens.  Defendants do not claim an intent to call any other person as a witness.

Although defendants assert at least three other Florida residents (three SolarBlue employees, and

unnamed and unnumbered SolarBlue accountants) are potentially relevant to this case,

defendants do not contend these individuals would be called to testify.

Nonetheless, even if these persons were called to testify, this factor is minimally

persuasive.  As the parties agree, there are direct flights from Orlando to Westchester County,

which are relatively short (less than three hours) and relatively cheap (less than $200, each way).

With respect to the location of relevant documents and access to sources of proof,

defendants assert SolarBlue's documents are in Florida.  However, "[t]he location of relevant

documents is largely a neutral factor in today's world of faxing, scanning, and emailing

documents."  <u>Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. Lafarge N. Am., Inc.</u>,

474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007), <u>aff'd sub nom.</u> <u>N.Y. Marine & Gen. Ins. Co. v.</u>

<u>Lafarge N. Am., Inc.</u>, 599 F.3d 102 (2d Cir. 2010).  Defendants provide no reason to conclude

their documents in Florida could not be digitized and thus available in New York with minimal

inconvenience.  Moreover, plaintiffs maintain their documents in New York.  Thus, this factor is minimally persuasive.

Regarding the locus of operative facts, defendants contend that two initial negotiations regarding the Agreement occurred in Florida.  Moreover, defendants assert the Agreement and Amendment were not formed, negotiated, or executed in New York, but provide no explanation of this conclusory argument, which conflicts with the allegations in the complaint.  The Court interprets this argument to contend that defendants were not in New York during various relevant times.  However, while this may be true, as already explained, a substantial portion of the operative facts occurred in New York.  Accordingly, the loci of operative fact is in both New York and Florida, and this factor does not strongly favor transfer.

For these reasons, defendants' arguments for transfer are not persuasive.  Moreover, other factors weigh heavily in favor of not transferring the case.

Importantly, plaintiffs chose this forum, which controls absent a "strong case for transfer."  Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 865 F.2d at 521.  Moreover, defendants do not contest plaintiffs' assertion that any unwilling witness can be compelled to testify, by deposition or otherwise.  Finally, the Agreement contains a choice of law clause designating New York law, and this Court is likely more familiar with New York law than is a judge in the Middle District of Florida.

Thus, based on the totality of the circumstances, including the above-mentioned factors, transferring this case to Florida is not warranted.

IV.    Failure to State a Claim

Defendants next contend the Court must dismiss the amended complaint under Rule 12(b)(6) for failure to state a claim.  Under New York law, "[t]he elements required to state a

valid claim for breach of contract are: (1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and, (4) damages resulting from the breach."  K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 827 F. Supp. 985, 988 (S.D.N.Y. 1993); accord, Orlander v. Staples, Inc., 802 F.3d 289, 294 (2d Cir. 2015).

Defendants do not articulate which breach-of-contract element is lacking, but the Court interprets defendants' argument to be that plaintiffs failed to plead a breach.  In substance, defendants argue they did not breach because the Amendment conditions Cohen's receipt of the Fee upon Cohen having introduced SolarBlue to the financing source, TowPath, and Cohen did not allege he introduced Towpath and SolarBlue.

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous."  Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016).  Whether a contract "'is ambiguous is a question of law to be resolved by the courts.'"  Id. (quoting W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990)).

> A contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.  A contract is unambiguous, however, if the contract language has a definite and precise meaning . . . and concerning which there is no reasonable basis for a difference of opinion.  [The Court] analyze[s] the ambiguity of a provision under the normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions.

Id. at 156–57 (citations and internal quotation marks omitted).

The Court concludes the contract is ambiguous.

In favor of plaintiff's proffered interpretation, that he did not need to introduce TowPath to receive the Fee, the Amendment states, "In consideration of Cohen to assist the Company to

arrange the Financing, the Company will pay to Cohen an amount equal to eight percent (8.00%) of the total commitments of the Financings for all or any portion of the Contracts, Properties or other Financings, which shall be earned and paid by the Company upon the closing of a Financing (the "Fee")."  (Cohen Decl. Ex. 8 at ¶ 2).  This broad language suggests that Cohen is owed the Fee if and when the Financing closes.  The Amendment continues, "This Agreement shall be an exclusive arrangement granted to Cohen.  The terms of this Agreement shall be applicable to <u>any</u> future Financings of the Company."  (<u>Id</u>.) (emphasis added).  Thus, this language affirms that Cohen maintained exclusivity and comports with Cohen's alleged motivation to amend the Agreement, namely, that the Amendment was meant to expand the scope of Financings for which he would receive the Fee.  Finally, the Amendment provides, "the Company's obligation to pay the Fee shall survive with respect to any Financing arranged by the Company or otherwise" (<u>id</u>.), reaffirming that Cohen would receive the Fee regardless of who arranged the Financing.  In sum, these portions of the Amendment suggest that Cohen was to assist SolarBlue in future Financings in exchange for the Fee with respect to all Financings, and SolarBlue's obligation to pay the Fee was not contingent upon Cohen having introduced or arranged the source.

However, plaintiffs' proffered interpretation is muddied by the presence of other language.  Specifically, the Amendment states, "The terms of this Agreement shall be applicable to any future Financings of the Company or its affiliates, with or without involving the Contracts, Properties or otherwise, which involves financing sources or parties that are or were introduced by Cohen to the Company."  (Cohen Decl. Ex. 8 at ¶ 2).  This language, which appears between the excerpts quoted immediately above, could be interpreted fairly to require SolarBlue to pay Cohen only if Cohen arranged the source of the Financing.  But this language is

16

hardly "definite and precise."  Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d at 157.  For example, it does not say the terms of the Agreement apply only to such Financings (i.e., only Financings arranged by Cohen), and it is unclear what language is modified by the clause, "which involves financing sources or parties that are or were introduced by Cohen to the Company."  Moreover, the latter interpretation flatly contradicts other language that suggests SolarBlue has more expansive obligations.

Finally, neither side offers an interpretation that makes sense of the Agreement and Amendment as a whole.  Indeed, each side cherry-picks language favorable to its own position and ignores the rest.  In addition, defendants simply contend ipse dixit that reliance on the contrary language "is misplaced" (Doc. #62 at 6), without explaining how or why.  Each side's proffered interpretation ignores certain language and, thus, fails to give full meaning and effect to all of the provisions in the Agreement and Amendment.  Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d at 157.

Considered as a whole, the language of the Agreement and Amendment is ambiguous, and therefore the Court must deny defendants' motion to dismiss for failure to state a claim.

## CONCLUSION

The motion to dismiss is DENIED.

The Clerk is instructed to terminate the motion.  (Doc. #47).

Dated:  February 17, 2017
        White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

17